NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210248-U

NO. 4-21-0248

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JERRY D. EXUM, | ) | No. 19CF1464 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Benjamin W. Dyer, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions of attempted first degree murder and aggravated battery were affirmed where (1) defendant's ineffective-assistance-of-counsel argument was rejected and (2) the trial court did not commit plain error by denying defendant leave to present surrebuttal evidence. One of defendant's ineffective-assistance claims was not conducive to review on the present record.

¶ 2    Following a jury trial, defendant, Jerry D. Exum, was convicted of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)) and aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)). He was sentenced to 34 years in prison. Defendant appeals, arguing that he received ineffective assistance of counsel and that the court erred by denying his request to present surrebuttal evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    Around 11:40 p.m. on October 5, 2019, defendant shot Davonte Wright and Lester Wells in the parking lot of a Champaign nightclub called 51 Main. The State charged

defendant with two counts of attempted first degree murder and two counts of aggravated battery.

¶ 5 Defendant initially denied any involvement in the shooting. At trial, however, defendant acknowledged shooting Wright and Wells but claimed that he acted in self-defense. According to defendant, approximately a month and a half before that shooting occurred, he was shot by Greg Smith. Defendant claimed he feared that Wright and Wells were going to hurt him for cooperating with the police in connection with Smith's prosecution. At the beginning of trial, the court granted a joint motion to exclude witnesses from the courtroom during other witnesses' testimony. The following is a summary of the evidence adduced at trial.

¶ 6 A. The State's Case

¶ 7 1. *The Victims*

¶ 8 Wright testified that he was with friends, including Wells, in the parking lot of 51 Main on October 5, 2019. At some point, a man Wright had never seen before came up to the group and got aggressive. Wright did not identify this person in court, saying only that this was an African American male who Wright would not be able to recognize again because it was dark when he saw him. According to Wright, this man walked past people and scuffed their shoes. The man appeared drunk. The man mentioned something about having been shot and possibly about having just gotten out of jail. The man then shot Wells and Wright. Wright remembered hearing the man's gun click twice before it fired. Wright was shot in the legs.

¶ 9 Wright denied having any firearm or weapon with him on October 5, 2019, and he denied owning a firearm. He also denied knowing Smith. Wright denied threatening defendant before October 5, 2019, claiming that he had never even heard defendant's name before this

shooting. Wright further denied that he was a member of a street gang. Wright acknowledged that he previously had been convicted of burglary and theft.

¶ 10    Although Wright did not identify defendant in court as the shooter, Wright did so from a photographic lineup while hospitalized shortly after the shooting. At trial, Wright testified that he vaguely remembered speaking with a police officer at the hospital.

¶ 11    Wells testified that he was with friends, including Wright, in the parking lot of 51 Main on October 5, 2019. Two men, who seemed angry or intoxicated and whose names were unknown to Wells, approached him and his friends. These two men started "having words" with Wells's group over things about which Wells did not know. One of those men, identified by Wells in court as defendant, said something about having been shot two weeks earlier. Defendant walked away. At some point, defendant returned and fired a gun at Wells. Wells could not discern any reason for the shooting, as he and defendant had not had any argument or confrontation. Wells fell to the ground and heard defendant shoot someone else.

¶ 12    According to Wells, someone named Christopher (a/k/a "Fat Folks") helped him into a car, and Wells was taken to a hospital. (Fat Folks died before defendant's trial.) The shooting left Wells paralyzed from the waist down. Wells described his injuries as "bullet wounds going through [his] inner stomach[,] flying out the back of [him]."

¶ 13    Wells denied having a gun or any other weapon on October 5, 2019. Nor did he see Wright with a gun. Wells denied being in a street gang and denied having heard of Smith prior to being shot. Wells acknowledged that he had previously been convicted of aggravated DUI, criminal trespass to a residence, and burglary. Wells's in-court identification of defendant as the shooter was consistent with his identification of defendant from a photographic array several days after the shooting.

¶ 14                    2. *Other Witnesses at 51 Main*

¶ 15          Charish Sanders was friends with Wells and Wright. She was outside 51 Main on the night of the shooting. From across the parking lot, Sanders saw a group of people arguing. Wright and Wells were among that group. The group, still arguing, made its way toward Sanders. Someone who was arguing with Wells then pushed Sanders out of the way. In court, Sanders identified defendant as the person who pushed her. After defendant pushed her, she turned around and saw that Wells had been shot. Fat Folks helped Wells into a car, and Sanders drove Wells to a hospital.

¶ 16          Sanders testified that she did not know Smith before this shooting. Sanders did not see either Wright or Wells with a gun at 51 Main. Nor did she see a gun after Wells got out of the car at the hospital. (A police officer who photographed this car after Wells arrived at the hospital likewise did not see any firearms in it. Police officers did not locate any firearms or weapons at 51 Main.)

¶ 17          Adrianna Tyler was the former general manager of 51 Main. Around 10:30 p.m. on October 5, 2019, she saw defendant having an argument with the head of the club's security. Defendant was adamant about not wanting to be searched, as he had already been inside the club that night. Tyler testified that the club had a "very strict three-point security checkpoint system in which you are checked once outside, once after you've paid, and then again on the third X in the entryway." According to Tyler, "it seemed that he [defendant] did unfortunately make it past the first checkpoint with that security guard, and once he was inside, the head of security noticed that he did not get searched outside and was explaining to him that you've got to get searched even if you were just in here ***." Defendant was "pretty upset" and argued with both Tyler and the head of security. This conversation took place inside the club, about two feet away from the

door. Defendant then "stormed out" of the club. At some unspecified later time ("the next thing that called my attention" after "running around" the club), Tyler heard two "booms." Tyler reviewed security footage from the club and gave it to the police.

¶ 18                                    3. *Defendant's Police Interview*

¶ 19            Very shortly after the shooting at 51 Main, defendant was identified as a possible suspect. An officer went to the apartment complex where defendant lived with his girlfriend. In front of defendant's apartment, an officer spotted a parked vehicle that matched a reported "vehicle of interest" in connection with the shooting. The officer waited in the area for a few minutes before defendant walked near him.

¶ 20            Body cameras recorded defendant's initial interaction with police officers outside the apartment, along with defendant's subsequent interrogation at the police station. Defendant repeatedly denied shooting anybody, and he told the police a story that he admitted at trial was untrue.

¶ 21                  4. *Additional Evidence Linking Defendant to the Shooting*

¶ 22            A few days after the shooting at 51 Main, a contractor who cut the grass at defendant's apartment complex found a revolver partially hidden under an air conditioning unit. It was later determined that projectiles removed from the bodies of Wright and Wells were fired from this gun. Defendant's fingerprints were on the gun.

¶ 23            The State introduced portions of security footage showing the parking lot of 51 Main on the night of the shooting. There was no audio recorded. The videos were rather dark, and the footage was captured from a distance. There was also a fence that partially obscured the camera's view of events. A digital forensic examiner for the Champaign Police Department

- 5 -

processed the security footage and digitally placed a highlighted circle around defendant to identify him among the crowd when it was possible to do so.

¶ 24 The first video clip started at 10:53 p.m. and ended at 10:56 p.m. In this clip, a group of individuals stood around some parked cars. Defendant then drove up and parked his vehicle. Another car arrived immediately thereafter and parked next to defendant's vehicle. Defendant and an unidentified individual approached the group. Defendant did not engage in any obvious fight or altercation. Defendant and another person then walked away from the group, and the video clip ended.

¶ 25 The second video clip started just before 11:41 p.m. and ended at 11:42 p.m. A group of individuals stood between parked cars. A car's lights were shining toward the camera, further diminishing the ability to discern what was happening. Approximately 55 seconds into the video clip, somebody was either pushed away from the group or ran away from the group from behind a parked car. Immediately thereafter, a darkly obscured figure partially emerged from behind that car and fired what appeared to be a gun at that person. Only one flash of a gunshot is visible in this video clip. The individual who was circled as defendant in the video then got into a vehicle and left the scene. Other people got into different cars and left too.

¶ 26 B. Defendant's Case-in-Chief

¶ 27 Defendant testified on his own behalf as follows. He was 31 years old, had never been "in any trouble," and never belonged to a street gang. On August 15, 2019, defendant was shot by Smith. Defendant agreed to cooperate with the police in connection with the investigation of that shooting. However, he requested that officers not come to his home, as he was afraid people from the neighborhood would see that he was speaking with the police. The police came to his home anyway, and he subsequently received threats to deter him from

testifying against Smith. For example, two weeks before the shooting at 51 Main, Wright and some other people drove past defendant's home with "guns out the window." Somebody in that car told defendant that he would "shoot this bitch up" if defendant's children were not outside. Such threats frightened defendant.

¶ 28      Defendant further testified that he wanted to tell the police about these threats, but he thought that doing so would only make things worse. Instead, defendant bought a gun from somebody he met at a liquor store. That gun had two bullets in it when defendant bought it, and he did not get any more ammunition.

¶ 29      Defendant explained that he went to 51 Main with a friend on October 5, 2019. Because of "the problems that were following" him, defendant brought the gun he had purchased. He admitted that he was the person who was digitally circled on the surveillance footage. With respect to the first video clip depicting his arrival at 51 Main, defendant testified that he saw some people he knew in the parking lot. He gave somebody in that group his bottle of liquor, and he walked toward the club with his friend. When defendant arrived at the club, he did not get into any dispute with the group congregating in the parking lot.

¶ 30      Defendant testified that he later returned to the parking lot and saw the same group of people, although a few more people had gathered. Fat Folks, Wells, and Wright were in that group. To the best of defendant's knowledge, Wells and Wright, whom defendant knew from around the "neighborhood," belonged to the Gangster Disciples street gang. Defendant was sure that Fat Folks and other people in the group knew Smith, so defendant wanted to talk to Fat Folks. Specifically, defendant wanted to tell Fat Folks that he was not going to "snitch" on Smith and that he did not want problems.

¶ 31        According to defendant, Wright told defendant to "go on with your police ass." Defendant responded that he was not the police and that the matter did not concern Wright. Defendant saw that Wright had a gun hanging out of his pocket. While defendant was trying to converse with Fat Folks, Wells likewise called defendant the "police." Defendant kept calm and was not loud or aggressive.

¶ 32        Defendant testified that Wells pulled out a gun, and then defendant did the same. Wells tried to run and turned sideways with his gun in his hand. Expecting to be shot, defendant turned away from Wells and fired his own gun. From a freeze-frame in the second surveillance video described above, defendant identified what he claimed was a gun in Wells's hand.

¶ 33        Defendant denied that he was aiming at anything when he fired his gun. He also insisted that he did not intend to kill or hurt anybody. Defendant stated that he fired his gun only to get away from the people in this group and to scare them. Defendant recounted that he was unable to run away from the situation or "tussle" with anyone, due to the injuries he had sustained when he was shot by Smith.

¶ 34        Defendant testified that, after the shooting at 51 Main, somebody told him to stay at the scene. Defendant decided not to do so, as he was afraid that he was going to be shot. He went home and put his gun under an air conditioning unit. He told his girlfriend about the shooting. She advised him to tell the police, and his mother advised him similarly. Defendant was trying to contact a lawyer to turn himself in when the police arrived at his home. Defendant admitted that he did not tell the police the truth about the shooting at 51 Main. One reason he lied was that he did not trust the police, given that they had dishonored his request to stay away from his home and his mother's home while investigating his being shot by Smith.

¶ 35        On cross-examination, defendant testified that he attended a meeting at his

mother's home with (1) Detective Robert DeLong, (2) a prosecutor, and (3) a victim advocate to

discuss the Smith case. Later during cross-examination, defendant suggested that Wright and

Wells testified against him falsely because they believed he was going to testify against Smith.

The prosecutor also referenced a September 17, 2020, meeting at the courthouse in connection

with the Smith prosecution. James Dedman (defendant's trial attorney), Detective DeLong, and

Justin Umlah (the assistant state's attorney (ASA) who was prosecuting Smith) were present at

that meeting. During that meeting, defendant said that he would not testify against Smith and that

he was willing to be held in contempt of court for the safety of his family. That meeting was one

month before defendant's trial, and it was the last communication that defendant had with

Umlah. On cross-examination, defendant also mentioned that he did not encounter either Wright

or Wells on the night of October 5, 2019, before he entered 51 Main.

¶ 36        On redirect examination, defendant testified that Umlah threatened him with life

in prison if he did not testify against Smith. Defendant further testified that, during the

investigation of the Smith shooting, he made it known to "them" that he did not want police

officers coming either to his home or to his mother's home. He instead wanted to meet elsewhere

or to discuss the case with officers via FaceTime.

¶ 37                        C. State's Rebuttal Evidence

¶ 38        The State called Detective DeLong as a rebuttal witness. DeLong testified as

follows. In August 2019, he was assigned as the lead detective on the case against Smith.

DeLong spoke with defendant on multiple occasions. One occasion was at defendant's mother's

residence, which was a meeting set up through the State's Attorney's office. Defendant requested

no marked police cars or uniformed officers at the house. Accordingly, DeLong picked up an

ASA and a representative from the victim's services division in an unmarked squad car. For that meeting, DeLong was not wearing a police uniform or a visible badge, and his gun was "covered up." Before this meeting, defendant never told DeLong that he did not want DeLong at the home. Had defendant told DeLong he did not want to meet there, DeLong would have arranged to meet elsewhere. When DeLong met with defendant, defendant was cooperative, which was unusual for a shooting case in Champaign. Accordingly, DeLong was doing whatever he could to ensure that defendant stayed cooperative. Defendant was upset about being shot but said he was not fearful of anything. Defendant never expressed annoyance that DeLong was at the residence. DeLong gave defendant his contact information. Defendant never contacted DeLong to say that he had received threats.

¶ 39    DeLong also testified about the September 17, 2020, meeting at the courthouse. During that meeting, defendant mentioned threats and that people had "ridden" by his mother's home at some point after defendant was shot. According to DeLong, defendant was rather "general" on this point, and defendant did not specify who the individuals were who drove past the residence. Defendant did not mention firearms being used in conjunction with those threats. DeLong also did not recall defendant saying anything about individuals yelling something from a vehicle. In DeLong's capacity as a detective on the Smith case, defendant never mentioned anything about Wright. Neither Wright's nor Wells's names ever came up during the investigation of the Smith case.

¶ 40    According to DeLong, during the September 17, 2020, meeting, Umlah did not threaten defendant with life in prison. Rather, Umlah explained to defendant that failure to testify could result in contempt of court. In a "worst case scenario informative statement," Umlah

notified defendant that contempt of court could result in "a rolling sentence that could result in life imprisonment."

¶ 41    DeLong further testified that the Champaign Police Department keeps "pretty extensive" records of gang affiliations. That information is collected from "[a]ll kinds of different" sources, including self-proclamations, informants, and information gleaned upon somebody's release from prison. In preparation for his testimony in defendant's case, DeLong checked whether there were "any contacts between Gregory Smith and Davonte Wright." DeLong testified that Smith did not have any gang affiliation. The prosecutor asked DeLong whether Wright had any gang affiliation. DeLong responded, "No." At that point, defense counsel Dedman raised a hearsay objection. The court sustained the objection but at that time did not direct the jury to ignore DeLong's answer to any questions. However, in its jury instructions, the court later directed the jury generally to "disregard questions and exhibits which were withdrawn or to which objections were sustained." DeLong testified that, during his time as a detective with the Champaign Police Department, he had never personally encountered anybody he knew was affiliated with the Gangster Disciples.

¶ 42    On cross-examination by Dedman, DeLong testified that Dedman stated during the September 17, 2020, meeting that Wright and Wells were part of Smith's gang. DeLong did not recall it "being the tone of [the] conversation" that Umlah said he "would personally see to it that [defendant] spent his life in prison if he didn't testify" against Smith.

¶ 43    On redirect examination, DeLong testified that Dedman specifically referred to the "Greg Smith Gang" during the September 17, 2020, meeting. DeLong then went back to the police department and investigated that matter. DeLong found no connection between Smith, Wells, and Wright.

¶ 44    On further cross-examination, DeLong testified that he did not contact Dedman to get more information about the "Greg Smith Gang."

¶ 45                    D. Request to Present Surrebuttal Evidence

¶ 46    After a recess in the proceedings, Dedman asked to present surrebuttal evidence from defendant's mother, Martha Thomas, who had been present in the courtroom when DeLong testified. According to Dedman, Thomas "says [DeLong is] lying about the meeting at her house, and she wants to testify to correct that in surrebuttal." The prosecutor objected, noting that there was a motion to exclude witnesses from trial and that Dedman told her at the beginning of trial that Thomas would not testify. Dedman responded that what the prosecutor said was correct, but he did not "know what else to do." Dedman added that he personally "can't testify about the other thing that [DeLong] lied about."

¶ 47    The court asked Dedman, "[W]hat specifically?" Dedman presented the following offer of proof:

> "She [Thomas] would testify that she was present and stood in the hallway and listened. That her son was upset because the police had come there to the house after he'd asked them not to. And she was the one who made the arrangements for them. And they were supposed to just be coming to see her, it was with the State's Attorney's office. But her son she said was very upset with them. He told them he didn't want them coming to the house like that, and he was upset, in contrast to what Mr. DeLong testified to."

The prosecutor responded that, even had there not been a motion to exclude witnesses, Thomas's testimony about defendant's statements would be hearsay. The court confirmed with Dedman

that Thomas would "contradict things that Mr. DeLong said on the stand about the condition of her son and some of the circumstances under which the meeting took place."

¶ 48            The court denied Dedman's request to present Thomas as a surrebuttal witness. The court reasoned that Thomas's proposed testimony did not "directly speak to one of the issues at play in this trial" and was "sufficiently collateral." The court also noted that defendant had the opportunity to testify about these matters, and Thomas had listened to "all of the other testimony in the case."

¶ 49                                    E. Verdict

¶ 50            In connection with the shooting of Wells, the jury found defendant not guilty of attempted first degree murder but guilty of aggravated battery. As to the shooting of Wright, the jury found defendant guilty of both attempted first degree murder and aggravated battery. The jury found that defendant personally discharged a firearm at Wright. The court determined that, in connection with the shooting of Wright, the aggravated battery count would merge into the attempted first degree murder count.

¶ 51                                    F. Posttrial Motion

¶ 52            Dedman filed a posttrial motion on defendant's behalf. Defendant then retained new counsel, who filed an amended posttrial motion. In the amended motion, defendant alleged that Dedman was ineffective in numerous respects. Only the following three allegations are specifically relevant to this appeal.

¶ 53            Defendant alleged that Dedman was ineffective for failing to impeach Wells with photographs in Dedman's possession showing Wells possessing a firearm and displaying "gang hand signs." In support of this allegation, defendant attached to his posttrial motion three pages of poor quality black and white photographs of multiple individuals. The record of exhibits

contains higher quality color versions of these photographs. What appears to be a gun is visible in two photographs, although there is no way to know from the record whether Wells was the person with the gun in either photograph. In various photographs, individuals are seen making different hand gestures, such as holding up either two or three fingers.

¶ 54　　　　Defendant also alleged that Dedman was ineffective for failing to communicate with Stephan Bess, who was a security guard at 51 Main. In support of this allegation, defendant submitted the following handwritten statement signed by Bess on January 3, 2021:

> "I Stephen Bess am a former security guard at 51 Main in Champaign. I checked Mr. Exum into the club that night. I observed no inappropriate actions from Mr. Exum that night. I also tried informing the other lawyer of [this?] also [*sic*]. He disregarded me."

¶ 55　　　　Defendant further alleged that Dedman "became a witness in the trial when he had the defendant testify about a conversation with the state's attorney that occurred in conjunction with a case that the defendant was the named victim." According to defendant, "[t]estimony about this conversation alluded to the defendant's belief that he was in danger because of his cooperation with the police in that investigation." Defendant asserted that, "[a]s trial counsel, Mr. Dedman could not call himself as a witness to this conversation which would have corroborated the defendant's version of events and his state of mind."

¶ 56　　　　The matters raised in the amended posttrial motion proceeded to an evidentiary hearing, at which defendant and Dedman testified. At the hearing, no mention was made of the allegation in defendant's amended posttrial motion that Dedman was a "witness."

¶ 57　　　　Much of defendant's testimony focused on his complaint, not raised as an issue in this appeal, that Dedman did not review surveillance videos with him until the morning of trial.

During defendant's testimony in support of the posttrial motion, new defense counsel played for the court two brief segments of surveillance footage that had not been shown at trial. These clips contained footage from a camera that seems to have been mounted outside the entrance to 51 Main. In these clips, defendant entered and exited 51 Main past Bess without obvious incident. At one point in the clip showing defendant's entrance into the club, Bess and defendant hugged. It does not appear that Bess searched defendant before defendant entered the club. Defendant can be seen exiting the club about 17 minutes later with another individual. There are no time stamps on this video footage to indicate what time defendant entered and exited the club. Defendant testified that he entered and exited 51 Main only once on the night of the shooting. Defendant testified that he and Bess knew each other very well.

¶ 58        Dedman testified that he did not have the subject photographs of Wells before trial, though he would have "loved to have" had them. At some point before trial, Dedman received from defendant's girlfriend a video of "one of the alleged victims" that had been posted on social media. The lawyers never clarified with Dedman what those videos showed. However, Dedman said that defendant's girlfriend did not provide him with the photographs that defendant relied on in his posttrial motion.

¶ 59        Regarding his decision not to call Bess as a witness at trial, Dedman recalled that he spoke with somebody who worked at 51 Main. Dedman determined that this potential witness did not have relevant testimony, as the person said only that "everything looked normal" when interacting with defendant on the night of the shooting. Dedman likewise did not believe that the video showing defendant entering the club was relevant. Dedman did not remember whether there was testimony at trial that defendant caused a disturbance at the front door of the club.

Dedman acknowledged that, if there were testimony that defendant caused a disturbance at the front door, a video showing something else would have contradicted such testimony.

¶ 60     The trial court denied defendant's posttrial motion. With respect to the impeachment of Wells with photographs, the court noted that "[w]e don't know where these photographs came from." Thus, Dedman would have had "difficulty laying the foundation" to introduce the photographs at trial. The court observed that it was unknown how it would have played out at trial had Dedman shown these photographs to Wells on the stand. However, in the court's view, "all of that is assuming counter-factually that we had those photographs prior to trial." The court did not think that the photographs were "a caliber of newly discovered evidence that would change the result of the trial." Moreover, although the court did not know whether Wells was displaying a gang sign in the photographs, "a hand sign doesn't conclusively prove that a person is or is not in a gang."

¶ 61     With respect to the proposed testimony of Bess and the surveillance video showing defendant entering and exiting 51 Main, the court noted that the trial testimony established that defendant entered and left the club twice. The court determined that it would not have "swung the balance in the case" had the jury heard evidence that defendant "behaved appropriately" during "one interaction."

¶ 62                                G. Sentencing

¶ 63     The court sentenced defendant to 26 years in prison for the attempted murder of Wright, to be served consecutively to an 8-year sentence for the aggravated battery of Wells. Defendant timely appealed.

¶ 64                                II. ANALYSIS

¶ 65                        A. Ineffective Assistance of Counsel

- 16 -

¶ 66    Defendant first argues that Dedman was ineffective for (1) failing to use available impeachment evidence against two witnesses, (2) failing to object to inadmissible testimony, and (3) litigating the trial while operating under an actual conflict of interest. Defendant alleges that these errors, individually and cumulatively, deprived him of a fair trial. The State responds that defendant has not demonstrated that he received ineffective assistance of counsel.

¶ 67    The governing principles are outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). In reviewing a claim of ineffective assistance, we apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the defendant must overcome the presumption that his counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. To sustain a claim of ineffective assistance, a defendant must show that his counsel's performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient where he or she made errors that were so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant establishes prejudice where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 68    We apply a bifurcated standard of review. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). We will defer to any factual findings the trial court made unless such findings are against the manifest weight of the evidence. *Nowicki*, 385 Ill. App. 3d at 81. However, we review

*de novo* the ultimate issue of whether counsel's actions constituted ineffective assistance. *Nowicki*, 385 Ill. App. 3d at 81.

¶ 69                                  1. *Failure to Impeach Wells*

¶ 70        Defendant first argues that Dedman was ineffective for failing to impeach Wells with photographs showing him holding a gun and flashing gang signs. However, the trial court determined that Dedman did not possess the photographs before trial. That finding was not against the manifest weight of the evidence, as it was consistent with Dedman's testimony at the hearing on the posttrial motion, and there was no contrary evidence presented. Defendant speculates that these photographs were screenshots from a video that Dedman possessed before trial. Nothing in the record establishes that fact. Defendant has not demonstrated that Dedman performed deficiently in this regard.

¶ 71                                  2. *Failure to Impeach Tyler*

¶ 72        Defendant next argues that Dedman was ineffective for failing to introduce both testimony from Bess and surveillance video to contradict Tyler's testimony that defendant "caused a disturbance shortly before the shooting."

¶ 73        "Decisions about which witnesses to call and which evidence to present ultimately rest with defense counsel." *People v. York*, 312 Ill. App. 3d 434, 437 (2000). Such decisions are generally viewed as matters of trial strategy that are immune from claims of ineffective assistance. *York*, 312 Ill. App. 3d at 437. Nevertheless, an attorney may perform deficiently by pursuing a trial strategy that is "so unsound that he or she fails to conduct any meaningful adversarial testing." *York*, 312 Ill. App. 3d at 437. Such may be the case, for example, where defense counsel fails "to make use of obviously useful impeachment against a key State witness." *People v. Vera*, 277 Ill. App. 3d 130, 140 (1995).

¶ 74        Tyler testified at trial that defendant mentioned entering 51 Main twice on the night of the shooting. According to Tyler, defendant was denied admission the second time because he would not consent to a search of his person. Defendant testified at the posttrial hearing that he entered the club only once. The trial court apparently found defendant's testimony on that point incredible, as the court mentioned in its ruling on the posttrial motion that defendant entered the club twice.

¶ 75        Against that backdrop, we hold that Dedman was not ineffective for failing to impeach Tyler with Bess's proposed testimony and surveillance footage from a camera mounted outside the club. The record does not establish that Bess, who was stationed outside the club's entrance, would have been positioned to hear or witness the events that Tyler recounted. Tyler testified at trial that she and her "head of security" engaged in a conversation with defendant when he tried to enter the club a second time. Tyler testified that the club had a "very strict three-point security checkpoint system in which you are checked once outside, once after you've paid, and then again on the third X in the entryway." According to Tyler, "it seemed that he [defendant] did unfortunately make it past the first checkpoint with that security guard, and once he was inside, the head of security noticed that he did not get searched outside and was explaining to him that you've got to get searched even if you were just in here ***." The video clips that defendant played at the posttrial hearing showed Bess standing outside the club. The most reasonable inference is that Bess was the security guard who allowed defendant into the club before Tyler and the head of security interacted with defendant. There was no evidence presented that Bess would have been able to hear or witness anything that happened inside the club. Thus, defendant failed to establish that either Bess's proposed testimony or the subject surveillance footage directly contradicted Tyler's testimony. Even if there were some

- 19 -

impeachment value to this evidence, Tyler was not a key trial witness, as she did not observe the shooting. *Cf. Vera*, 277 Ill. App. 3d at 140 (finding that counsel's failure to impeach a witness was ineffective assistance because such failure "weighed heavily" in the case).

¶ 76　　　　　At the posttrial hearing, Dedman testified that he determined that the proposed impeachment evidence had little relevance. Considering the entire record, Dedman's determination was reasonable and constituted a permissible trial strategy.

¶ 77　　　　　3. *Failure to Make Timely Objections and Move to Strike Testimony*

¶ 78　　　　　Defendant next argues that Dedman was ineffective in relation to DeLong's rebuttal testimony regarding the contents of the Champaign Police Department's records. Defendant argues that DeLong's testimony was hearsay and was not based on personal knowledge. Defendant contends that Dedman erroneously made a delayed objection and failed to request the court to instruct the jury to disregard the improper testimony.

¶ 79　　　　　The relevant exchange between the prosecutor and DeLong was as follows:

"Q. Does the Champaign Police Department keep records of gang affiliation?

A. Yes.

Q. And how does the Champaign Police Department gather that information?

A. All kinds of different ways. Sometimes it's self-proclaimed by people. Other times it's information learned from informants. Other times it's information learned upon somebody's release from prison we would receive that information. It's a file maintained by our Intel Division.

Q. Would you agree that it is a pretty extensive record?

- 20 -

A. Yes.

Q. In preparation for your testimony today, did you go back and see whether or not there was [*sic*] any contacts between Gregory Smith and Davonte Wright?

A. I did check that.

Q. Does Gregory Smith have any gang affiliation?

A. No.

Q. *** Does Davonte Wright have any gang affiliation?

A. No."

At this point, Dedman raised a hearsay objection. The court sustained the objection but did not specifically instruct the jury at that time to disregard any testimony. However, in its jury instructions, the court later directed the jury generally to "disregard questions and exhibits which were withdrawn or to which objections were sustained."

¶ 80          " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). DeLong's testimony that he checked records was not itself hearsay. Accordingly, Dedman did not perform deficiently by failing to object to the question of whether DeLong checked whether there were contacts between Smith and Wright.

¶ 81          Dedman subsequently objected to the prosecutor's question regarding Wright's gang affiliation, and the court sustained that objection. Although the court did not contemporaneously direct the jury to disregard DeLong's response to this question, the court subsequently instructed the jury to disregard questions to which objections were sustained.

Generally, we must presume that jurors follow the court's instructions. *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 46.

¶ 82    However, Dedman did not timely object to DeLong's testimony about Smith's lack of gang affiliation. The State does not dispute that DeLong's testimony on this point was hearsay. Nevertheless, the State argues that defendant was not prejudiced by this testimony.

¶ 83    After carefully considering DeLong's testimony regarding Smith's gang status in light of the totality of the evidence, we hold that defendant did not suffer prejudice from the admission of this hearsay evidence. Again, under *Strickland*, prejudice means that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 84    Defendant's trial theory was that he shot Wells and Wright in self-defense when Wells pulled a gun on him in the parking lot of 51 Main. Defendant claimed that Wright was also armed that night. Wright also purportedly had threatened defendant with a gun before the night of the shooting. According to defendant, the source of Wells's and Wright's animus toward him was their belief that he intended to cooperate with the police in connection with the Smith case. The defense argued that Wells, Wright, and Smith were members of the same gang, the Gangster Disciples.

¶ 85    In the hearsay testimony at issue, DeLong essentially said that the Champaign Police Department had no record that Smith was a gang member. Obviously, a person could be a gang member even if the police had no record of it. As Dedman noted during closing argument:

"Like gangs register with the police department. That's not how it works at all." Arguably, a police department's lack of knowledge that somebody is in a gang does little to prove that a person is *not* in a gang.

¶ 86    Far more damaging to the defense was the properly admitted evidence. For example, although defendant claimed that Wright and Wells were armed on October 5, 2019, police officers never recovered any guns linked to them. Wright and Wells also denied being gang members and denied knowing Smith. Sanders, who was friends with Wright and Wells, likewise testified that she did not know Smith. Additionally, DeLong testified that, during his time as a detective in Champaign, he had never personally encountered somebody he knew was affiliated with the Gangster Disciples. Although defendant argued self-defense at trial, he admitted that he lied to police officers during the investigation of the shooting at 51 Main. Defendant also acknowledged that before the shooting at 51 Main, he never told police officers that he was receiving threats for cooperating with the police in prosecuting Smith.

¶ 87    Considering the totality of the evidence, there is no reasonable probability that the jury rejected defendant's self-defense claim just because DeLong testified that the Champaign Police Department had no record of Smith being in a gang. Accordingly, Dedman's failure to object more promptly when the prosecutor elicited testimony about internal police records does not undermine our confidence in the outcome of the trial. Defendant has not demonstrated prejudice under *Strickland*, so his ineffective-assistance claim fails.

¶ 88                                    4. *Conflict of Interest*

¶ 89    Defendant finally claims that Dedman improperly "continued to litigate this trial despite operating under an actual conflict of interest." This claim stems from Dedman's vague statement to the trial court that he could not "testify about the other thing that [DeLong] lied

- 23 -

about." Essentially, defendant argues that Dedman should have sought to present his own testimony to impeach DeLong, even if that meant having to withdraw as defendant's counsel toward the end of trial.

¶ 90 In *People v. Veach*, 2017 IL 120649, ¶ 48, our supreme court held that a reviewing court "should carefully consider each ineffective assistance of counsel claim on a case-by-case basis" to determine whether the claim is conducive to review on direct appeal. The court explained that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649, ¶ 46. In accordance with *Veach*, we have considered whether the record is sufficient to evaluate defendant's claim of ineffective assistance based on a conflict of interest. For the following reasons, we determine that this claim is not conducive to review on the present record.

¶ 91 "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36. Illinois recognizes two categories of conflicts of interests: *per se* and actual. *Yost*, 2021 IL 126187, ¶ 37. A *per se* conflict arises in three circumstances: "(1) when defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel was a former prosecutor who was personally involved in the prosecution of the defendant." *Yost*, 2021 IL 126187, ¶ 66. Unless a defendant waives the right to conflict-free counsel, a *per se* conflict requires automatic reversal of a criminal conviction. *Yost*, 2021 IL 126187, ¶ 39.

¶ 92          By contrast, an actual conflict of interest requires a defendant to "identify an actual conflict that adversely affected his counsel's performance." *Yost*, 2021 IL 126187, ¶ 38. The defendant also must "identify a specific deficiency in his counsel's strategy, tactics, or decision making that is attributable to the alleged conflict." *Yost*, 2021 IL 126187, ¶ 38. "Speculative allegations and conclusory statements are insufficient to establish an actual conflict of interest." *Yost*, 2021 IL 126187, ¶ 38. "An actual conflict generally, if not exclusively, involves joint or multiple representation." *People v. Austin M.*, 2012 IL 111194, ¶ 82.

¶ 93          Defendant claims that Dedman labored under an actual conflict of interest because he litigated the case while he was also a potential witness. The gravamen of defendant's argument is that Dedman was ineffective for failing to testify to impeach DeLong's rebuttal testimony, even if that meant having to withdraw as counsel. The record is inadequate for us to evaluate the merits of this claim. At trial, Dedman cryptically insinuated that he had personal knowledge that DeLong lied about something in his rebuttal testimony. However, when the court asked, "[W]hat specifically," Dedman submitted an offer of proof regarding Thomas's proposed surrebuttal testimony. Dedman never explained what he had meant when he implied that he knew that DeLong was lying.

¶ 94          In presenting his ineffective-assistance claim, defendant assumes that Dedman could have offered admissible surrebuttal testimony that would have meaningfully assisted the defense and impacted the trial. But without knowing what Dedman was referencing, we have no way of knowing whether that was the case. The record also does not reflect whether Dedman discussed the issue with defendant off the record. Of course, defendant may have agreed that Dedman should not request to testify, undermining defendant's current claim of a conflict of interest. We cannot decide an ineffective-assistance claim in a factual vacuum.

¶ 95　　　　Accordingly, we hold that defendant's ineffective-assistance claim in connection with Dedman's alleged conflict of interest is better suited for collateral proceedings, where defendant will have an opportunity to develop a factual record.

¶ 96　　　　　　　　B. Denial of Request to Present Surrebuttal Evidence

¶ 97　　　　Defendant also argues that the court erred by denying his request to present surrebuttal testimony from Thomas. Defendant recognizes that he did not preserve this issue for review, as he did not include it in his amended posttrial motion. Defendant urges us to review the matter pursuant to both prongs of the plain-error doctrine. The State responds that the trial court acted within its discretion and that defendant has failed to demonstrate plain error.

¶ 98　　　　The plain-error doctrine applies in two situations. The first is "when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error.' " *People v. Sebby*, 2017 IL 119445, ¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The other is "when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Sebby*, 2017 IL 119445, ¶ 48 (quoting *Piatkowski*, 225 Ill. 2d at 565). "In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Typically, the first step in the analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 99　　　　Had defendant preserved the issue, we would have applied the abuse-of-discretion standard to review the court's decision to deny leave to present surrebuttal evidence. See *People v. Sims*, 244 Ill. App. 3d 966, 1000 (1993) ("The law on permitting surrebuttal testimony is that the court has discretion to refuse to allow this testimony if no new matters were raised in rebuttal.

[Citation.] On review, the question then becomes, did the trial court abuse its discretion in denying the surrebuttal testimony which resulted in manifest prejudice to the defendant?"). Generally, a court abuses its discretion where its decision is " 'arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court.' " *People v. Hauck*, 2022 IL App (2d) 191111, ¶ 35 (quoting *Seymour v. Collins*, 2015 IL 118432, ¶ 41). A defendant "cannot obtain relief on an unpreserved error under the plain-error doctrine if he would not have been entitled to relief on the same error if preserved." *People v. Williams*, 2022 IL 126918, ¶ 49.

¶ 100 Defendant has not demonstrated that the court abused its discretion in denying surrebuttal evidence, thus there was no clear or obvious error. Defendant testified in his case-in-chief that he told police officers that he did not want them coming to his home or Thomas's home. The State then rebutted that evidence with testimony from DeLong, who claimed that defendant never told him those things. Defendant requested leave to present surrebuttal testimony from Thomas to corroborate defendant's testimony. The State's rebuttal evidence merely contradicted defendant's testimony, so the State did not raise a new matter that justified surrebuttal testimony. See *People v. Williams*, 180 Ill. App. 3d 294, 304 (1989) ("Rebuttal evidence limited to contradicting the defendant's prior testimony does not raise new matters."). Thomas's proposed testimony also was problematic because she sat through the trial despite an order to exclude witnesses from the courtroom.

¶ 101 The trial court determined that the proposed rebuttal testimony would be impeachment on a collateral matter. During the hearing on the posttrial motion, defendant's posttrial counsel conceded that point. On appeal, defendant argues that Thomas's testimony was not collateral, as defendant was entitled to rebut a charge of recent fabrication. Specifically, defendant argues that DeLong insinuated that defendant recently fabricated his claims that he was

- 27 -

threatened and that he was upset by the police coming to the home after he told them not to do so. As defendant did not ask the trial court to allow Thomas's testimony to rebut a charge of recent fabrication, we cannot say that the trial court abused its discretion or committed a clear or obvious error.

¶ 102                                    III. CONCLUSION

¶ 103          For the reasons stated, we affirm the judgment of the circuit court of Champaign County.

¶ 104          Affirmed.