THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANCISCO VERA, Defendant-Appellant.

First District (1st Division)   No. 1—94—0284

Opinion filed December 4, 1995.—Rehearing denied January 31, 1996.

Thomas K. McQueen, Robert R. Stauffer, and David Jimenez-Ekman, all of Jenner & Block, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D.

Carroll, and James S. Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

This case arises from a violent street encounter between a group of Mexican-Americans (Mexicans) and a group of Italian-Americans (Italians).

One of the Italian youths was shot and severely wounded by one of the Mexicans. Defendant Francisco Vera (Vera) was charged with attempted murder. After a bench trial, he was convicted of aggravated battery with a firearm. He was sentenced to 17 years' imprisonment. He appeals his conviction and sentence.

The trial judge was faced with evidence that required him to choose between two possibilities: either, as the State said, Vera was the shooter, or, as the defense urged, Humberto Beltran was the shooter.

The evidence was closely balanced. At times it was conflicting. The trial judge was entitled to relevant evidence that could tilt that balance. Because of serious errors by defense counsel, the trial judge was not able to consider evidence that could have changed the outcome of this case. For that reason, we reverse the defendant's conviction and remand the case for a new trial.

EVIDENCE

On September 2, 1990, Vera and his friends attended a social gathering at a church located near the intersection of Grand Avenue and Noble Street.

Late that evening, Joseph Dzialo, Richard Arcand, Luigi Franceschetti, Robert Otero, Michael and Orlando Cantenese, and Randy and Larry Leffew were hanging out at the Burger Baron restaurant, located at the corner of Grand and Noble.

According to the Italians, the Mexicans appeared to be fighting among themselves. The Italians crossed the street to investigate the commotion and ended up in a fight. According to the Mexicans, there was no fighting before the Italians crossed the street.

Joseph Dzialo testified that after he crossed the street he was shot in the face by a person he did not see. He was unarmed, did not fight, and did nothing to provoke anyone to shoot him. As a result of a bullet entering his skull, Dzialo lost his eye and underwent several reconstructive surgeries.

Kevin Mooney testified he lived in a building on the corner of Grand and Noble in September of 1990. At approximately 1 a.m. on September 3, Mooney heard a commotion that sounded like a fight.

When he looked out his bedroom window, he saw approximately five men fighting, two Hispanic and three white. One of the Hispanic men stopped a dark blue van which had just made a right turn from Grand onto Noble. The van was double-parked on Noble Street. The driver of the van got out, produced a pistol, and fired two shots in the air. The shooter then walked around the front of the van, walked east toward the sidewalk, and fired three more shots in the direction of the fight.

Mooney made an in-court identification of Vera as the shooter. After Vera fired the shots, said Mooney, he got into the dark blue van and drove off. The other Hispanic men got into a white van, which was parked between two other cars, and attempted to leave.

Later that morning, Mooney viewed a lineup at the police station and identified Vera as the shooter. He testified that the male Hispanic gunman from the dark blue van was in his line of sight during the entire incident.

On cross-examination, Mooney testified that defense investigator John Rea visited him at home. Rea showed him two photographs. One was a photo of Humberto Beltran. The other was a photo of the defendant. The two men are facial look-alikes. Rea asked Mooney to identify the shooter. Mooney was unable to do so and told Rea the two men looked a great deal alike.

Robert Otero was at the Burger Baron on the evening of September 2, 1990. He testified that, at approximately 1 a.m., he noticed a man walking across the street firing warning shots into the air with a pistol. Otero made an in-court identification of Vera as the shooter. Otero noticed a man with a chain on the ground, fighting with another Hispanic man. The man with the chain was a different individual than the shooter; however, he never saw the face of the man with the chain. Otero was five feet away from Vera when he saw him firing the gun. Otero identified Vera as the shooter in a police lineup early the morning of September 3.

Otero observed several vehicles parked on the street near the scene, including a white van and a blue van. The blue van arrived from westbound Grand Avenue, turned onto northbound Noble and eventually double-parked on North Noble. He did not see the shooter before he saw the blue van.

Luigi Franceschetti testified that just prior to 1 a.m. on September 3, 1990, he was in a car with his girl friend near the Burger Baron. He heard some shots. Luigi jumped out of the car and ran to where the shooting was occurring. He saw a man with a gun. Luigi made an in-court identification of Vera as the man with a gun. Vera was wearing a white shirt. Luigi got a good look at Vera's face. When Luigi

was 10 feet away from Vera, he saw him point the gun at Dzialo and shoot him. Vera ran to a white and tan van and got in it. Luigi punched the back window of the van. Randy Leffew broke the front windshield with a 2 x 4. The white van was parked next to the curb between two cars. The driver of the van moved the van back and forth rapidly in an attempt to get out from between the two cars.

Later that morning, Luigi and Larry Leffew went with the police to the 1300 block of Walton. At that location Luigi saw the white van. Luigi identified Vera as the man who had shot Dzialo.

Larry Leffew testified that at approximately 1:10 a.m. on September 3, 1990, he noticed "a bunch of [Hispanic] guys fighting" across from the Burger Baron parking lot. After Leffew walked across the street, he saw a Mexican swinging a chain at Michael Catanese. A blue van pulled around the corner and a man wearing a white dress shirt exited the passenger side of the van with a gun. Leffew made an in-court identification of Vera as the man with the gun. Leffew said he saw Vera shoot Dzialo. Vera and some other individuals then jumped into a beige van parked nearby. The van started moving back and forth hitting cars. "[T]hey started shooting again out of the van." Randy Leffew hit the van's windshield with a 2 x 4 and Luigi Franceschetti punched his hand through the van's rear window.

Orlando Catanese was in the parking lot of the Burger Baron restaurant in the early morning of September 3, 1990. There seemed to be a disturbance on the northeast corner. Orlando went to where the fight was occurring and saw a man hit his brother with a chain. Orlando heard a gunshot and saw a man waving a gun around. He told the man it was not necessary to fire the gun and then turned around and saw Dzialo lying on the ground shot. Orlando did not see Dzialo in a fight with anyone or with any weapon. Orlando did not make an identification of the person who shot Dzialo.

On the morning of September 3, 1990, Chicago police officer Carlos Ramirez monitored a call regarding a man shot at Grand and Noble. Ramirez monitored a second call regarding the address of the owner of the vehicle involved in the shooting. Ramirez went to the 1300 block of Walton Street, where he saw a white van with a brown stripe. The van had a broken windshield and there was blood inside. Vera was placed in custody. He was not wearing a shirt. At approximately 2 a.m. Larry Leffew and Luigi Franceschetti arrived at that location and each separately identified Vera as the man who shot Dzialo.

On September 3, 1990, Detective Foley was assigned to investigate the Dzialo shooting. At approximately 7:30 that morning Kevin Mooney and Robert Otero each identified Vera in a lineup at the police station.

After the admission of various photographs and certified documents of title relating to the white van, the State rested. The trial court denied defendant's motion for a directed finding.

The first witness defendant called was Humberto Beltran. After stating his name, Beltran invoked his fifth amendment right against self-incrimination. Defense counsel sought to submit Beltran physically into evidence, alleging a physical similarity between Beltran and Vera. The trial court stated: "That's your conclusion. If there is a physical similarity it is very remote from what I see."

Richard Arcand, testifying as a hostile witness, said that at approximately 1:15 a.m on September 3, 1990, he was in the parking lot of the Burger Baron with some of his friends, including Dzialo and the Catanese brothers. Arcand noticed a disturbance across the street and went to see what was happening. Arcand, the Catanese brothers, Otero, and the Leffew brothers went across the street. Arcand and his friends, except Dzialo, became involved in a fight. During the course of the fight, a Mexican man swinging a chain attempted to hit Arcand and his friends. The man with the chain was being beaten up by three of Arcand's friends. A blue van heading westbound on Grand Avenue turned north on Noble Street, stopped, and a Mexican man got out with a pistol in his hand. The man fired some shots and got back into the blue van. In Arcand's opinion, Vera was not the shooter, but was the man who had been wielding the chain. Arcand identified a photograph of Beltran as the shooter and a photograph of Vera as the "Mexican" with the chain.

Elfega Huerto, Beltran's roommate, was declared a hostile witness. She testified that she left the party with Beltran in their blue van. They drove to the corner of Grand and Noble, where they saw people fighting. The van stopped and Beltran got out. Huerto heard some shots, but was unable to see who fired them. Beltran got back in the van and they drove off. Huerto did not see Beltran with a gun that night.

Reyna Lopez left the party with Beltran. She saw a fight at the corner of Grand and Noble. The blue van stopped and they got out. She heard gunshots. Vera did not fire the shots. He was being hit by two men at the time. Lopez didn't notice if Beltran had a gun.

Defense counsel attempted to impeach Lopez through the use of a transcript of a tape-recorded conversation between Lopez and Vera. In this conversation Lopez allegedly identified Beltran as the gunman. The trial court ruled that because the transcript was unreliable it would not be admitted as evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 115—10.1 (West 1992)) or as an offer of proof.

Patricia Ramos attended the party with Beltran and others. She left with Vera and some others. When they were getting into the defendant's van, another group of white men arrived and began to fight with them. Her husband, German Guerrero, was attacked. Beltran then pulled up in his van, got out, and fired some shots with a gun. Beltran shot the man who was beating up Vera. Vera and the others then got into the Vera's van and drove away. On cross-examination, Ramos admitted that although her husband was arrested with Vera she never told the police that Vera did not shoot anyone.

Enrique Valencia testified that he left the party with Vera and others. As they approached Vera's van, someone appeared and began pushing Guerrero. Vera told the person to settle down. Other people from the Burger Baron came out and jumped on Vera. Vera attempted to defend himself with a chain. Beltran arrived in his blue van. Beltran got out with a gun in his hand. He shot twice in the air, "shot to the guy" that was fighting with Vera, then got back in his van and left. Vera and the others got back in Vera's van. Enrique never told the police that Beltran had committed the shooting.

Alfredo Valencia went to the party with Beltran and left with Vera and others. He was involved in a fight near Vera's van. During the fight, Beltran's van approached the scene. Valencia lifted his hands in the air, and the van stopped. As Alfredo was fighting with one of the strangers, he heard two shots and saw two flashes. At the time Alfredo saw the flashes, Vera was on the ground being beaten by two strangers. Valencia never saw who had the gun.

Angel Urena went to the party with Beltran in a blue van and left the party with Vera, her husband Alfredo Valencia, and others. As the group approached Vera's van, a group of men appeared and began to fight with the men in Vera's group. Vera came out of the van and was attacked. Another van arrived and Urena heard three shots from behind her back. She saw the man who had Vera by the neck fall to the ground. Urena could see Vera at the time of the shots. Vera did not have a gun in his hand. Urena did not know who shot Dzialo. She admitted that at the time she was in shock and not paying much attention to who was doing what at the time. Although Urena knew that Vera was in custody she did not tell the police that he had not shot anyone. She never saw Beltran with a gun.

German Guerrero left the party with Vera and some others. As they were walking to Vera's van, a group of men approached them and began beating them. Guerrero heard a shot and the sound of someone falling to the ground. He did not see Vera during the course of the fight. Later, Guerrero testified that he saw the man who had

been beating Vera fall down contemporaneously with the shot that was fired. Guerrero did not see who shot Dzialo.

Francisco Vera testified that he left the party at the church between 11 p.m. and midnight. As Vera approached his van, he and Guerrero were attacked by a group of men. The men hit Vera in the head and he defended himself with a chain. Vera "lost track" and was helped to his van. Vera had trouble starting the van because he felt "very bruised." He then drove away. Vera stated that he did not have a gun and did not shoot Dzialo.

Defense investigator John Rea testified that he spoke to Kevin Mooney on August 4, 1991. Rea showed Mooney the photos of Beltran and Vera. Mooney could not determine who was the shooter.

Both sides rested.

The court stated it was convinced beyond a reasonable doubt that Vera was the shooter. However, since it could not say based on the evidence whether or not the defendant had the specific intent to kill the victim, it entered a finding of guilty of aggravated battery with a firearm.

DECISION

Three issues raised by the defendant merit discussion.

■ First, we find, after viewing the evidence in the light most favorable to the prosecution, that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (See *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889.) We will not second-guess the trial judge.

Second, we conclude the trial judge was correct when he refused to draw any inference favorable to the defendant from Humberto Beltran's invocation of the fifth amendment.

Although the defendant failed to preserve the issue in his post-trial motion (see *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124), we have reviewed it under the plain error doctrine because the evidence was close and the issue bore directly on the fairness of the trial. See *People v. Keene* (1995), 169 Ill. 2d 1.

A witness called by a defendant in a criminal case has the constitutional right to refuse to answer questions which tend to incriminate him. *People v. Fryer* (1993), 247 Ill. App. 3d 1051, 1064, 618 N.E.2d 377; *People v. Loya* (1980), 90 Ill. App. 3d 1078, 1087, 413 N.E.2d 1361, 1367.

Beltran's right to invoke the fifth amendment is not at issue. What is at issue is whether the trier of fact may properly draw inferences from a witness' invocation of the fifth amendment in a criminal proceeding.

Defendant cites *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199, and *People v. Loya* (1980), 90 Ill. App. 3d 1078, 1088, 413 N.E.2d 1361, in support of his position. The State contends that these cases are not controlling. We agree with the State.

The right to call a witness is not absolute, and it is not error for the trial court to prohibit calling a prospective witness who has indicated that he will invoke his fifth amendment rights. (*People v. Cunningham* (1984), 130 Ill. App. 3d 254, 265, 473 N.E.2d 506, citing *People v. Cvetich* (1979), 73 Ill. App. 3d 580, 391 N.E.2d 1101.) Illinois courts have held that it is improper for a party to call a witness he has reason to believe will invoke the privilege before the jury, and a trial judge does not err when he precludes calling such a witness. *People v. Nally* (1985), 134 Ill. App. 3d 865, 870, 480 N.E.2d 1373, 1377, citing *People v. Cvetich* (1979), 73 Ill. App. 3d 580, 391 N.E.2d 1101.

In *Nally*, the defendant asserted on appeal that the trial court erred in barring him from calling a witness after the witness advised the court he intended to invoke his fifth amendment privilege against self-incrimination if called to testify. (*Nally*, 134 Ill. App. 3d at 869, 480 N.E.2d at 1377.) The defendant relied on the supreme court's decisions in *People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261, and *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199.

In *Miller* and *Nelson* the court considered the issue of whether a defendant's appointed counsel, an assistant public defender, had a conflict of interest and rendered ineffective representation because another attorney from the same office represented a codefendant. In each case, the court held that there was no conflict and the attorney had loyally and zealously represented his client. In each case, the defense attorney had successfully requested the opportunity to call the codefendant, despite the witness' intention to invoke his privilege against self-incrimination. In each case, the witness asserted the privilege before the jury. Both times, the court observed this tactic may well have benefited the defendant. *People v. Nelson* (1980), 82 Ill. 2d 67, 73-75, 411 N.E.2d 261; *People v. Miller* (1980), 79 Ill. 2d 454, 463-64, 404 N.E.2d 199.

In *Nally*, the court found that in *Miller* and *Nelson* the legal propriety of the defense request to allow a witness to invoke the fifth amendment in front of the jury was not at issue and "the decisions do not suggest that the general rule applicable in such cases has been eroded." (*Nally*, 134 Ill. App. 3d at 870, 480 N.E.2d at 1377.) The reasoning in *Nally* is sound.

■ We agree with the holding in *United States v. Atnip* (7th Cir. 1967), 374 F.2d 720, where the defendant called a witness who refused

to testify, asserting the fifth amendment. In closing argument, defense counsel attempted to argue an inference from the witness' refusal to answer but was precluded by the trial court. On appeal, the Seventh Circuit Court of Appeals held that there was no prejudicial error in the ruling of the trial court:

> "There surely was a lack of evidentiary value in a witness' refusal to answer questions under the Fifth Amendment privilege. Such a refusal to testify does not have probative relevance on the issue of the defendant's guilt or innocence." *Atnip*, 374 F.2d at 723.

The trial judge correctly held it would be improper for him to draw any inferences from Beltran's refusal to testify by invoking the fifth amendment.

The third issue raised by the defendant is his claim that he received ineffective assistance of counsel. To prevail, the defendant must prove (1) his lawyer's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the defense lawyer's errors, the outcome of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 692, 80 L. Ed. 2d 674, 696, 104 S. Ct. 2052, 2067; *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246.) A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. House* (1990), 141 Ill. 2d 323, 388, 566 N.E.2d 259.

We recognize that neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. (*People v. Edwards* (1991), 218 Ill. App. 3d 184, 198, 577 N.E.2d 1250.) The defendant must overcome a "strong presumption that counsel's complained-of action or inaction was merely trial strategy." *People v. Medrano* (1995), 271 Ill. App. 3d 97, 100, 648 N.E.2d 218, 221.

■ We have identified three instances where defense counsel's representation of the defendant fell below an objective standard of reasonableness:

(1) *The failure to lay a foundation for admission of the tape recording of Reyna Lopez's conversation with the defendant.*

Reyna Lopez was a passenger in Beltran's van. At trial, she denied that Beltran had the gun and that he fired the shots. But during a conversation in Spanish with the defendant, recorded by defense counsel, she purportedly said it was Beltran who had the gun and it was Beltran who fired the gun while the defendant was being beaten.

Defense counsel attempted to offer into evidence an English translation of the conversation. He made no effort to authenticate the transcript. When the judge rejected the transcript because it

lacked foundation, counsel did nothing more to attempt to prove the accuracy of the transcript. The trial judge refused to consider the transcript as evidence or as an offer of proof. The defendant was deprived of important eyewitness testimony.

Under section 115—10.1 of the Code of Criminal Procedure a tape recording of a witness' statement is admissible as substantive evidence if the statement is inconsistent with the witness' trial testimony and the witness is subject to cross-examination. (725 ILCS 5/115—10.1 (West 1992).) The proponent must prove the statement was accurately recorded. Once he has done that, no further showing of reliability is required. *People v. Carlos* (1995), 275 Ill. App. 3d 80.

We agree with the defendant that his trial lawyer should have anticipated that the translation would require an adequate foundation. Further, once the trial judge expressed dissatisfaction with the English transcript, defense counsel should have asked for a continuance to bring in the interpreter.

A similar failure to establish a foundation for important evidence was held to be ineffective assistance of counsel in *People. v. House* (1990), 141 Ill. 2d 323, 566 N.E.2d 259. There, the defendant's lawyer attempted to offer the victim's exculpatory statements as dying declarations. He failed to establish an adequate foundation for the statements. The court held the lawyer should have known the nurse attending the victim could have provided the foundation. Failure to obtain that foundational evidence was incompetent representation.

In *People v. Claumuextle* (1994), 255 Ill. App. 3d 504, 626 N.E.2d 741, the defense lawyer's failure to ask for a continuance to locate an alibi witness was held to be an objectively unreasonable error. That was a jury trial. Granting a continuance in this case would not have obstructed the course of the bench trial. Defense counsel should have asked for time, rather than unconditionally surrender the evidence.

(2) *The failure to properly impeach Robert Otero.*

The trial judge, at the close of the case, said he found Robert Otero's testimony "helpful."

Otero testified he saw the defendant aim and fire the gun. During cross-examination, defense counsel asked Otero about a conversation he had with a defense investigator, John Rea. Otero denied telling Rea that the male Mexican with the gun got out of the blue van which was double-parked on Noble Street. Otero admitted that Rea showed him the photos of Beltran and the defendant, but he denied telling the investigator he could not tell which person in the photos was the person he identified at the lineup.

Rea was called as a witness at trial. He was not asked any questions about his conversation with Otero. The post-trial motion, filed

by a newly appointed defense lawyer, contained Rea's report of the interview as part of an affidavit. In the report, Rea writes that Otero told him "the male Mexican with the gun had got out of the blue van which was double parked on North Noble," and "there is no doubt in his mind that the white over tan van is a different van than the van from which the male Mexican with a gun had emerged." Further, Rea reports Otero as saying "he could not identify which of the individuals depicted in the two photographs he had identified at the police station or which of the two individuals depicted in the photographs was the shooter."

We are authorized by *People v. House*, 141 Ill. 2d at 388-89, to consider Rea's post-trial affidavit when we weigh the incompetency claim. If Rea, an experienced investigator and former Federal agent, had testified in accord with his report, Otero's testimony on critical points would have been impeached. The color of the van the shooter came out of assumed vast importance in this case. The two photographs shown Otero demonstrate that Beltran bore a striking facial similarity to the defendant at the time of the shooting. The defendant, and the trial judge, were deprived of important impeachment.

The trial judge, in his findings, relied on the failure to impeach Otero:

> "I do point out Rea testified in this case and of course Rea was not asked nor did he respond to any question regarding what Otero may or may not have told him. He testified, but there was nothing. There was no perfection of any impeachment so I assume there's no impeachment and I really question why of course that was asked of Mr. Otero."

Clearly, then, counsel's failure to impeach Otero weighed heavily in this case. Failure to make use of obviously useful impeachment against a key State witness was a denial of effective assistance of counsel in *People v. Salgado* (1994), 263 Ill. App. 3d 238, 635 N.E.2d 1367. In *People v. Skinner* (1991), 220 Ill. App. 3d 479, 581 N.E.2d 252, we held that a defense lawyer's failure to cross-examine the State's eyewitness on his prior silence about the burglary was ineffective assistance of counsel. That was a bench trial. And in *People v. Garza* (1989), 180 Ill. App. 3d 263, 535 N.E.2d 968, the defense lawyer's failure to confront an eyewitness with inconsistent descriptions she had given before trial was held to be ineffective assistance.

In *Salgado, Skinner,* and *Garza,* the courts noted that the evidence was closely balanced. In this case, four witnesses, including Mooney, testified that the shooter left the shooting scene in the blue van. Beltran owned the blue van and he was in it when stopped by police. Five witnesses identified the man who emerged from the blue

van at the shooting scene as Beltran. Two witnesses said the shooter left in the brown (tan and white) van owned by Vera. Three witnesses said the man driving the brown van was not the shooter. This was a nighttime shooting. Two groups of young men were involved in the melee. While four witnesses said the defendant fired the shots, four witnesses, including Arcand, a member of the "Italians" group, said he did not. Another three witnesses said the shooter, whom they did not identify, was not the defendant.

This was a closely balanced case.

(3) *The failure to address the trial court's concern about Richard Arcand's testimony.*

Richard Arcand was called by the defense as a hostile witness. He was a member of the "Italians" group. Arcand identified Beltran as the shooter and Vera as the man wielding the chain. He was a reluctant witness. Defense counsel used Rea's report to refresh Arcand's memory. The trial judge was disturbed by the date on the report. It was dated September 15, 1991, and recounted interviews with Arcand on September 4 and October 7, 1991.

Since the report was used only to refresh the witness' memory, its date should not have made much difference. But the judge was concerned about the apparent date discrepancy, calling the report "an unreliable document." The defense lawyer said he would have Rea explain the inconsistency. He called Rea to the stand, but never asked him about the dates on his report. Rea's affidavit, filed with the post-trial motion, explains how the dates came to be placed on the report. The trial court, virtually writing off Arcand's testimony, noted that the "mystery" regarding the inconsistent dates never was cleared up.

The defense lawyer could have addressed the trial court's concern with little effort. His failure to do so in the context of this case was ineffective assistance.

## CONCLUSION

Our review of the record persuades us there is a reasonable probability that the result in this case could have been different had the trial judge been given the relevant, admissible information that was available. The defendant has established the prejudice required by *Strickland*. Although any one error of counsel, by itself, may not have satisfied the two-prong test established in *Strickland*, "cumulatively, counsel's failures render the result of the proceedings 'unreliable under the standard enunciated in *Strickland*.'" *People v. Garza*, 180 Ill. App. 3d at 270, quoting *People v. Solomon* (1987), 158 Ill. App. 3d 432, 437, 511 N.E.2d 875.

Because we believe the defendant did not receive the effective assistance of counsel guaranteed by the sixth amendment to the United States Constitution, we reverse his conviction and sentence and remand the case for a new trial.

Reversed and remanded.

BUCKLEY and BRADEN, JJ., concur.