NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 200465-U

NO. 4-20-0465

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 24, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| CAMERON D. ROSS, | ) | No. 17CF1747 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed defendant's convictions of and sentence for
aggravated battery with a firearm and unlawful possession of a weapon by a felon,
concluding (1) trial counsel was not ineffective for failing to file a motion to sever
the charges and (2) defendant's sentence was not excessive.

¶ 2            In March 2020, a jury convicted defendant, Cameron D. Ross, of Class X felony

aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) in connection with the

December 11, 2017, shooting of Taveon Davis and Class 2 felony unlawful possession of a

weapon by a felon (720 ILCS 5/24-1.1(a), (e) (West 2016)) in connection with his possession of

a firearm when he was arrested on December 12, 2017. The trial court sentenced defendant to

consecutive terms of 30 and 14 years of incarceration consecutive to the sentence imposed in

another case. Defendant appeals, arguing his trial counsel rendered ineffective assistance when

he failed to move to sever the aggravated battery with a firearm charge from a charge of unlawful possession of a weapon by a felon. He also argues his sentence is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In December 2017, the State charged defendant in part with aggravated battery with a firearm, alleging, on December 11, 2017, defendant knowingly discharged a firearm, causing bodily injury to Taveon Davis. The State also charged defendant with unlawful possession of a weapon by a felon, alleging, on December 12, 2017, defendant possessed a firearm when he was previously convicted of a forcible felony. The State further charged defendant with armed violence (720 ILCS 5/33A-2(a) (West 2016)), alleging, on December 12, 2017, defendant possessed the firearm at the same time he possessed heroin.

¶ 5           A. Stipulation and Limitation of References to Previous Felonies

¶ 6          On September 6, 2018, defendant's appointed counsel filed a motion *in limine* seeking to prohibit the State from introducing evidence of defendant's previous convictions in Oklahoma of two counts of attempted robbery with a firearm, assault with a dangerous weapon, and assault and battery with a dangerous weapon. The State told the trial court it had no objection to the motion unless defendant opens the door by suggesting he had never been convicted of anything.

¶ 7          The same day, the parties filed a stipulation stating, "on December 19th, 2012, the Defendant was convicted of a forcible felony offense." The parties agreed defendant was convicted of the four forcible felonies subject to counsel's motion *in limine*, but the jury would be told only the language of the stipulation and all jury instructions would reference "a forcible felony" rather than the name of any specific felony.

- 2 -

¶ 8		On October 30, 2018, defendant discharged his appointed counsel and hired private counsel Steven Sarm. Sarm renewed the motions to exclude references to defendant's previous convictions and pending charges and entered a new written stipulation with the State consistent with the September 6, 2018, stipulation.

¶ 9		B. Jury Trial

¶ 10		On February 26, 2019, the trial court conducted a jury trial. In opening statements, the State told the jury it would hear a stipulation defendant had previously been convicted of a forcible felony, and for that reason, he was not allowed to possess a firearm.

¶ 11		Lieutenant Matthew Henson of the Champaign Police Department testified, on December 12, 2017, he was part of a surveillance detail at an apartment complex to look for defendant after locating a white Oldsmobile vehicle connected to defendant there. Defendant was with two other men with the hood up on the Oldsmobile when Henson and other officers approached him. Officers ordered defendant to the ground. Defendant complied, and Henson handcuffed him. Henson did not see defendant make any furtive movements and did not see what the other two men by the car were doing. A search revealed a semiautomatic pistol in defendant's front pants pocket. The pistol contained a 17-round capacity magazine with 10 rounds in it. Defendant falsely told Henson his name was "Troy." During Henson's testimony, the trial court told the jury, "The parties stipulate that on December 19, 2012, the defendant was convicted of a forcible felony offense."

¶ 12		Detective Matthew Quinley testified he was present with Henson on December 12, 2017. After officers handcuffed defendant, Quinley rolled defendant onto his side and located a small bag of heroin where defendant's face had been while lying on the ground and a second bag of heroin about three inches between defendant's face and the vehicle. Quinley did not

converse with the other two men who were present or notice any movements on their part because he was focused on defendant.

¶ 13　　　　Detective Jeremiah Christian testified he was also present on December 12, 2017. When officers approached the car, Christian saw defendant and the two other men, who Christian identified at trial as Preston Winfrey and James Wood, looking over the engine area of the vehicle. When ordered to the ground, Winfrey and Wood "had a very shocked reaction," stepped back from the vehicle, and immediately complied. Christian described Winfrey and Wood as "very upset." They told Christian defendant approached them at an auto parts store to solicit their help in installing an alternator on the vehicle. The officers did not find weapons or drugs on either man. Wood had an open bottle of alcohol that Christian discarded into a dumpster.

¶ 14　　　　Detective Corey Phenicie testified, on December 12, 2017, he was with the surveillance team looking for a white Oldsmobile and a black and gray Dodge pickup truck. When the officers were at the apartment complex, Phenicie saw both vehicles there, with the truck approximately 70 yards away from the Oldsmobile. Phenicie stated when the officers ordered the men to the ground, he saw defendant "backpedaling" between two vehicles and reaching for his waistband area. He did not see Winfrey or Wood make any furtive movements or reach into any pockets. Phenicie did not have his body camera on at the time. Phenicie found a 9-millimeter cartridge case in the bed of the truck.

¶ 15　　　　Tashanee Turner testified she was married to Taveon Davis. About three weeks before Davis was shot, Turner met defendant at her grandmother's house. At that time, defendant was dating Turner's sister, Desiree Jones. Turner testified, on that day, defendant arrived in a white vehicle and asked Davis "why were me and my husband were fighting." She said

defendant "was trying to fight [Davis]" on the porch. Turner defended Davis by spraying defendant with mace. The incident ended when defendant left with Jones.

¶ 16		On December 11, 2017, Turner and Davis went to a gas station to buy a bottle of Prairie Farms grape juice and granola bars. According to Turner, as they were walking across the street after making the purchases, they saw defendant driving a black truck out of an apartment complex. Turner and Davis walked through a strip mall to avoid the truck, but it followed them. Turner testified she and Davis "were having words with [defendant] to see—why did he just follow us through the parking lot." Turner said she threw the grape juice bottle at the truck, and defendant, while seated in the driver's seat, leaned over two people in the passenger's seat and shot Davis through the passenger window. Turner testified the front of the truck was facing a light. She was about five feet away and could see defendant's face and his hand on the gun. She also agreed she could "tell definitely it was [defendant] shooting." Turner and Davis ran to the gas station and asked a clerk to call the police. Another clerk tended to Davis's gunshot wound. After about five minutes, the police arrived, and Turner testified she told them defendant shot Davis. Davis was taken to the hospital, where he had surgery. At the hospital, Turner met with detective David Griffet and identified defendant as the shooter in a photograph. At trial, Turner identified a photograph of the truck defendant was driving.

¶ 17		On cross-examination, Turner stated she told officers a person who looked very similar to Sean Williams, who was "light-skinned" with a beard, was one of the passengers in the truck. She denied telling Griffet there was only one other person in the truck. Turner said she did not recall what defendant was wearing. When asked if she told officers she thought the shooter might be her sister's boyfriend, Turner stated she never said that and said, "I knew definitely.

That's what I told them at the gas station, in the car, at the hospital." She said the shooting happened near the sidewalk, with two cars in front of the truck.

¶ 18            Video of Turner's statements to made to Officer Tyler Darling, while he transported Turner to the hospital, include clips of her telling Darling she thought the shooter was her sister's boyfriend. She mentioned two shots and said the shooting happened in the parking lot next to the gas station. She said the truck was black or dark in color, but she really was not sure because it happened so fast. When asked if it was the same truck her sister's boyfriend got in, she replied, "That's what I said, he drives that truck." However, later at the hospital, she told Griffet she had not seen defendant in a truck before. She also told Griffet defendant "has not one reason to shoot my husband," and agreed it was just "happenstance" the way she and Davis crossed paths with defendant.

¶ 19            Davis testified about the altercation a few weeks before the shooting and verified Turner sprayed mace on defendant. On the night of the shooting, Davis saw defendant in the truck and told Turner he felt something was not right and suggested they turn around. Defendant followed them, and Davis asked him "[w]hy you steady pulling up on us" and said "[y]ou F—ing her little sister." Davis said defendant was "smirking at me the whole time, just smirking—like just smirking at me, woo, woo, woo." Davis saw Turner doing something with her juice bottle and told her not to throw it but she did anyway. Davis testified he was able to see the gun in defendant's hand when defendant shot him through the passenger window. He remembered seeing two or three other people in the truck. When asked if the police showed him a photo lineup at the hospital, Davis initially stated he did not remember, but then when shown the lineup documents, said he remembered being shown a lineup. He did not remember if he identified anyone, stating he was weak and fell asleep at the hospital and "woke up with tubes in me."

¶ 20    On cross-examination, Davis testified he did not remember telling police after the shooting he did not know who shot him. He remembered Turner told him she had already identified defendant as the person who shot him. When pressed further about his lack of memory, Davis stated, "I told you, sir. I ain't trying to be rude or nothing, but all my life I've been dodging bullets, so that was big in my life, so I really don't remember when that happened, you know. I had to get my lung cut." When asked if that meant he did not know who shot him, Davis said, "No, that's not what I'm saying. I know who shot me. I'm just saying I don't remember what I told him yesterday. That's like I don't remember, you know, two years ago what I told my parent or my sibling." The following colloquy then occurred:

"Q. Okay. In all of your interviews with police prior to the photo lineup, do you recall telling the police that you didn't know who shot you?

A. I don't understand what you're trying to ask me.

Q. Sir, at the hospital, Detective Griffet was asking you questions about this incident?

A. Right.

Q. And a specific question he asked you is do you know who shot you? And did you tell him, 'I do not know who shot me'?

A. I don't think so. I think I told him I did. I think I verified what my wife told him.

Q. So is it your testimony here, Mr. Davis, that you told Detective Griffet that you did know who shot you?

A. I did. I told him that—I told him that—he said is this correct, what your wife said when I eventually woke up and I was eating some soup. I think I was

eating some chicken soup. I let them know, I said yes, that is correct. And I asked my wife afterwards did I do the right thing or not? She said he shot me for no reason. I did.

Q. So you have no independent recollection of what happened, you're relying on your wife's statements; is that correct?

A. No. I have recollection on what happened. I just don't know whether the word came from me first or her first, because I was ill after—it's like if something happened to you, you know. Whether the word going to come from you first or the person that love you first, whether you verify it or not, that's what happened."

The further additional colloquy occurred:

"Q. So your testimony today, Mr. Davis, is that when questioned by officers at [the gas station], you told them you knew who shot you?

A. Bro, I seen him shoot me, bro, on the holy Bible. I'm ready to get up, bro. I seen the man shoot me, bro. Come on, bro. Why is you doing this to me? Come on now. Really I shouldn't even be sitting here.

Q. How many people were in the truck, Mr. Davis?

A. Three people. It was about three heads in there. But if a jeeper creeper shoot you, bro, ain't you going to remember what the jeeper creeper looks like, bro? Ain't you, bro?

THE COURT: All right, sir. Mr. Davis, wait until he asks you a question.

Q. Mr. Davis, I'm—you were questioned—strike that.

Are you basing your testimony today, Mr. Davis, on what your wife told you?

A. No. I'm basing my testimony today that all men need to stand up like me, and it ain't all about snitching, straight up. Sometimes you got to do what you got to do to be there for your family. No way. The police would be looking for me right now or I—if I don't show up, I'll get a warrant or something for something that I was never in the wrong about. We had an altercation. That should have been that. Nobody should have got shot, none of that, so understand that.

Q. Just so I'm clear, [Mr. Davis]—this is last question I'm going to ask you—when asked if you knew who shot you, you told Detective Griffet you did not know who shot you, correct?

A. I don't even recall that, honestly."

¶ 21 Doctor Richard Barnard Berlin Jr. testified he treated Davis at the hospital. Berlin stated Davis had a gunshot wound "through his back." Kathryn Doolin, a forensic scientist testified the cartridge case found in the truck matched the firearm found on defendant. Anne Hendren, a clerk at the gas station, testified Turner specifically told the police defendant shot Davis. Champaign police officer Johnathan Broadnax testified he responded to the call from the gas station, and Turner said defendant shot Davis. Another officer, Brian Ahsell, identified a photo of a Prairie Farms grape juice bottle taken a few feet away from a street curb.

¶ 22 The State called Turner's grandmother, Gwenda Harris, as a witness, who stated she could not remember a conversation with a police officer about the night of the altercation on her front porch. However, investigator David Monahan, testified he spoke with Harris and recorded the conversation with his body camera. That video showed Harris told Monahan about

the altercation, including details about how Turner sprayed defendant with mace and that defendant said "I'm gonna kill that motherf\*\*\*".

¶ 23            Griffet testified he spoke with Davis shortly after he arrived at the hospital. He said he asked Davis if he knew who shot him, and Davis said "he didn't know his name," but "he would be able to identify him by photo if shown a photograph of him." The conversation was recorded on Griffet's body camera and played for the jury. That video shows Griffet asking defendant if he knew who shot him. Defendant answered "no," and stated "but I swear to God on the Holy Bible I got shot for no reason." Defendant stated the shooter had a black Dodge truck with tinted windows. He said there were "four dudes." After viewing the video, Griffet agreed at no point in that video did Davis ever indicate he could pick out the shooter.

¶ 24            Griffet testified Turner told him she was "95 percent sure" one of the other men in the truck was Sean Williams. However, Griffet discovered Williams had been posting live videos to Facebook from a city in Missouri at the time of the shooting. In reference to the video of the hospital interview, defense counsel also asked Griffet if Turner could come up with a reason why defendant would want to shoot Davis. Griffet replied, "Not during that interview, no." However, he stated the information about the previous altercation on Harris's porch was conveyed during the totality of the interview. Video of the full interview is not in the record.

¶ 25            Griffet testified he arranged for another officer, Detective Robert DeLong, to show a photo lineup to Davis. DeLong was not informed who the suspect was. When Davis was awake and available, DeLong showed Davis the lineup, and Davis identified defendant as the shooter.

¶ 26            The defense called Darling who responded to the call to the gas station. He testified Turner gave him the names of two suspects, defendant and Sean Williams. He stated at

first Turner seemed like "she wasn't terribly sure" defendant was the shooter, "but as she—as we got into the conversation more, she seemed sure of herself in my opinion." He admitted Turner stated at one point the shooter looked like defendant, but she was not sure it was defendant. Turner also did not recall the make and model of the pickup truck. On cross-examination the State asked, "Isn't it true that during the course of conversation with her, she vividly described the driver as [defendant] and gave a physical description of him?" Darling answered "[y]es." However, on redirect examination, Darling agreed Turner was describing what defendant would look like based on the altercation from three weeks earlier.

¶ 27        During closing arguments, the State mentioned the stipulation defendant was previously convicted of a forcible felony. Sarm did not dispute defendant's guilt of possession of a weapon by a felon. Instead, Sarm stated, "I am not going to sit here and look you in the collective eyes and suggest that [defendant] was not in possession of a weapon. I'm not going to suggest that. I think the evidence is pretty clear that [defendant] was in possession of a handgun." Sarm then argued the State failed to prove defendant guilty of armed violence because it failed to prove defendant possessed the heroin. Regarding the aggravated battery charge, defense counsel argued Turner and Davis were not credible witnesses and pointed out multiple inconsistencies in their testimony. Sarm asked the jury to find defendant not guilty of armed violence and aggravated battery with a firearm. The jury found defendant guilty of unlawful possession of a weapon by a felon and aggravated battery with a firearm but acquitted him of armed violence.

¶ 28                                C. Sentencing

¶ 29        At the April 11, 2019, sentencing hearing, Detective Jody Cherry testified about his investigation of a shooting on December 8, 2017, in which the victim, Antonio Brown, identified defendant as the shooter. Cherry personally performed the investigation and interviews

in the case and also reviewed the reports of other officers and was familiar with the physical and scientific evidence. Cherry testified a witness saw Brown's car stop in the roadway in front of a dark pickup truck. She then saw the passenger of the pickup truck digging around inside of the truck and she heard gunshots. She could not see the driver. She ducked down and, by the time she looked back up, both vehicles were fleeing. The investigation later revealed defendant was one of the occupants of the truck. Six 9-millimeter cartridge cases were found at the scene that matched the gun recovered from defendant's pocket on December 12, 2017.

¶ 30        The owner of the pickup truck, Sarah Wilson, stated she loaned the truck to defendant on the night of the shooting and had loaned it to him on other occasions. Wilson's daughter, Kailey, had been dating defendant at the time and told the police defendant had gotten a gun about three weeks before the shootings. After the shooting of Brown, defendant told Kailey the truck was "too hot" to drive for a while. Brown's story of the events to the police were "initially vague." However, he described the truck in detail. After the shooting of Davis, Cherry showed Brown a photo of the truck, and Brown identified it. He then gave a more detailed statement and ultimately identified a photo of defendant as the shooter. DNA evidence recovered from the truck included defendant as a "contributor." Defendant did not object to Cherry's testimony or the admission of related exhibits.

¶ 31        The defense presented character-letters in mitigation from defendant's father and the mother of his newborn child. Defendant gave a statement in allocution and admitted "as a convicted felon," possessing a weapon "wasn't anything I was supposed to do," but said he thought "protection *** was needed." He stated he was a good father and asked for forgiveness. However, he did not specifically take responsibility for any crime other than unlawful possession of a weapon by a felon. In a letter to the court, defendant denied committing the other crimes.

¶ 32    The presentence investigation report (PSI) showed defendant's criminal history in Oklahoma and showed he was adjudicated delinquent in Oklahoma when he was a juvenile for attempted robbery. In Illinois, he was convicted of mob action in the case involving the shooting of Brown. It also showed he had a history of employment in 2017.

¶ 33    The trial court stated it considered the PSI, the letters submitted by defendant, and defendant's comments. The court found no statutory factors in mitigation applied. The court found defendant's age of 27, his "marginal employment," early childhood foster care, and that he had "gotten his GED" as non-statutory factors in mitigation. The court found defendant's criminal history and the need for deterrence as statutory factors in aggravation. The court noted the seriousness of the crime and the evidence that, three days earlier, defendant shot Brown. The court stated, "Mr. Ross is a dangerous individual. Why he shoots people for whatever slight he perceives is incredibly troubling." The court then stated, "I believe not only is the maximum sentence appropriate for aggravated battery with a firearm, but the Court has to make a determination as to how to fashion the unlawful possession of weapon by a felon sentence." Regarding that sentence, the court stated,

> "This defendant shot two people in the course of three days, went on the run with a gun, and God only knows who else he was going to shoot. There didn't appear to be anything that was going to deter him from opening fire on anybody else who crossed his path who he had a beef with."

Based on those findings, the court sentenced defendant to the maximum penalty of 30 years' incarceration for aggravated battery with a firearm to be served consecutive to 14 years for unlawful possession of a weapon by a felon and consecutive to the sentence imposed in the case involving Brown's shooting.

¶ 34                                      D. Posttrial Motions

¶ 35            Sarm did not file a motion for a new trial or to reconsider sentence. Instead, he

filed a motion to withdraw as counsel, stating defendant had fired him and asked him to

withdraw. On April 22, 2019, defendant filed a *pro se* motion, alleging ineffective assistance of

trial counsel based in part on Sarm's failure to file a motion to sever the aggravated battery

charge from the other charges. The court appointed new counsel, who filed a motion for a new

trial based on ineffective assistance. New counsel also filed a motion to reconsider sentence,

arguing the sentence was excessive and the court placed too much weight on Cherry's testimony.

Counsel did not make any hearsay arguments.

¶ 36            At the hearing on the motions, defendant testified he wanted Sarm to attempt to

sever the charges and discussed the matter with him, but it was never done. Sarm testified about

strategic decisions made at trial regarding his decision not to call alibi witnesses or challenge

various items of evidence. Sarm expressed frustration with defendant because Sarm negotiated a

plea agreement, but defendant would not accept it based on an unreasonable belief Turner and

Davis would not appear at trial. Regarding allegations concerning a motion to sever, the

following colloquy occurred:

            "Q. Did you discuss with [defendant] the possibility of filing a motion to

      sever charges?

            A. I can't independently recall ever having that discussion, nor [defendant]

      asking me to do that. However[,] given my experience, in my opinion that would

      have been a futile motion."

On cross-examination, the following colloquy occurred:

"Q. In this case immediately prior to proceeding to trial you secured with the State a stipulation regarding [defendant's] prior criminal conviction that was the forcible felony that was an element of one of the charges, correct?

A. Yes.

Q. And is it correct that at trial all we did was mention the existence of the forcible felony pursuant to the stipulation, and basically nothing more was said about it?

A. That's correct. As a matter of fact, I was provided a stipulation, and I— I also believe that as a motion *in limine* I included that as well.

Q. So do you think you did everything you could to appropriately limit any discussion of his prior record as far as what the jury was actually able to hear at trial?

A. Yes.

Q. Regarding [defendant's] complaint regarding a putative motion to sever charges, would it be fair to say that there was a lot of factual relevancy in between the shooting that occurred on December 11th, 2017, and the circumstances of the defendant's arrest on [December] 12th of 2017?

A. Yes.

Q. That included some forensic evidence linkages, correct?

A. Yes.

Q. That forensic evidence included but was not limited to the matching of [cartridge cases] from the shooting scene to the gun that was found on [defendant's] person, correct?

A. Correct.

Q. Those same [cartridge cases] matched to another [cartridge case] that was found in the bed of a pick-up truck discovered near where [defendant] was arrested on December 12th, correct?

A. Correct.

Q. And is it also correct that the black pick-up truck that was found near where he was arrested with that [cartridge case] in the pick-up was also positively identified by both the victim and the victim's wife as the car [defendant] was in at the time of the shooting?

A. It was correctly identified, and that truck was very unique. The paint was—was coming off, and it was faded in different areas. It was a very unique truck.

Q. And therefore with those considerations—not necessarily exclusively those, but did you think that a motion to sever charges would be granted if you filed it?

A. No."

Although Sarm testified about cartridge cases found at the "shooting scene," the record does not reflect that cartridge cases were found at the scene of Davis's shooting. Instead, cartridge cases were found at the scene of Brown's shooting. Sarm stated he did not object to Cherry's testimony at sentencing because such an objection would have been overruled.

¶ 37    The trial court denied the motions, finding Sarm did not provide ineffective assistance and, in any event, defendant would not have been prejudiced because the evidence against him was overwhelming. The court stated the sentence was appropriate because defendant

was dangerous, and the sentence was necessary to keep him out of society and to protect other individuals.

¶ 38       This appeal followed.

¶ 39                              II. ANALYSIS

¶ 40                    A. Ineffective Assistance of Counsel

¶ 41       On appeal, defendant first argues ineffective assistance of trial counsel because Sarm did not move to sever the unlawful possession of a weapon by a felon charge from the aggravated battery with a firearm charge. He argues trying the charges together allowed the jury to improperly hear evidence of his propensity for violent crime as it related to the aggravated battery with a firearm charge and counsel, by conceding the unlawful possession of a weapon by a felon charge, had no reasonable strategy in allowing the charges to be tried together. The State contends the issue was one of reasonable trial strategy and, even if error, it did not prejudice defendant where the evidence of his guilt was overwhelming.

¶ 42       To prevail on a claim of ineffective assistance of counsel, a defendant must prove (1) his lawyer's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for the defense lawyer's errors, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[N]either mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *People v. Vera*, 277 Ill. App. 3d 130, 138, 660 N.E.2d 9, 16 (1995). When assessing the deficient-performance prong, "a court must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy." *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10, 972 N.E.2d 340.

- 17 -

¶ 43 To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceedings' result would have been different. *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163-64 (1999). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. House*, 141 Ill. 2d 323, 388, 566 N.E.2d 259, 288 (1990) (quoting *Strickland*, 466 U.S. at 694). The *Strickland* Court noted, when a case is more easily decided on the ground of lack of sufficient prejudice rather than concluding counsel's representation was constitutionally deficient, the court should do so. *Strickland*, 466 U.S. at 697. See also *People v. Torres*, 228 Ill. 2d 382, 395, 888 N.E.2d 91, 100 (2008) (stating if a defendant fails to prove deficient performance, the trial court need not consider the prejudice prong, and vice versa). While allowing a jury to hear evidence a defendant was previously convicted of a felony carries the risk of significant prejudice, when the evidence of defendant's guilt is not closely balanced and instead is overwhelming, the prejudice-prong of the *Strickland* test is not satisfied. See *People v. Wiley*, 2022 IL App (4th) 210283, ¶¶ 42-44.

¶ 44 Here, we need not, and do not, determine whether Sarm's performance was deficient when he conceded the unlawful possession of a firearm charge (a not unreasonable trial strategy under the circumstances) but did not move to sever it from the other charges, because we determine defendant did not show prejudice. The evidence against defendant was overwhelming. The initial altercation between defendant and Davis provided motive for the shooting. Indeed, Harris told an officer defendant, after the altercation, said "I'm gonna kill that motherf***." Both victims identified defendant as the shooter. Turner specifically stated she saw defendant in the truck, had "words" with him, and saw him lean over the passengers in the truck and shoot Davis. Turner was only about five feet away, near a light, and could see defendant's

face and his hand on the gun. She told officers both at the gas station and on the way to hospital that she thought defendant was the shooter. She also identified defendant from a photograph and identified the truck. Davis also identified defendant as the shooter. While the defense elicited some inconsistencies in his testimony and suggested he was basing his identification on Turner's memory, he emphatically stated he saw defendant shoot him. The cartridge case found in the back of the truck the next day was connected to the gun recovered from defendant, providing a physical link between the gun and the truck used in the shooting. Further the gun was missing rounds, indicating it had previously been fired.

¶ 45       Defendant points to various weaknesses or inconsistencies in the evidence to argue the evidence of his guilt was not overwhelming. We are aware of the alleged imperfections in the State's case defendant has identified. However, we disagree with defendant's conclusion these imperfections prevent a finding the evidence of his guilt was overwhelming. Evidence may be deemed overwhelming even in the absence of physical evidence or a confession or where a defendant questions the credibility of witnesses. See *People v. Weston*, 2011 IL App (1st) 092432, ¶¶ 38, 42, 956 N.E.2d 498; see also *People v. Bost*, 80 Ill. App. 3d 933, 944, 400 N.E.2d 734, 743 (1980) (stating evidence was overwhelming despite some conflicting testimony). When viewed as whole, the evidence here was overwhelming despite its imperfections. As a result, defendant's argument fails. Accordingly, defendant has failed to show his trial counsel's assistance was ineffective.

¶ 46                          B. Defendant's Sentence

¶ 47       Defendant next contends his sentence was excessive. He argues the trial court gave Detective Cherry's testimony too much weight because of double hearsay and a lack of

corroboration about the shooting of Brown on December 8, 2017. He also argues his sentence was excessive based on the circumstances of the offenses.

¶ 48 "[A] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Little*, 2011 IL App (4th) 090787, ¶ 22, 957 N.E.2d 102. The trial court has discretion when sentencing, and we will not reverse the court's decision absent an abuse of that discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.

¶ 49 In determining what sentence to impose, the trial court may consider (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34. The seriousness of the offense is the most important sentencing factor, and the trial court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense. *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112.

¶ 50 "The trial court is not required to expressly indicate its consideration of all mitigating factors and what weight each factor should be assigned." *People v. Kyse*, 220 Ill. App. 3d 971, 975, 581 N.E.2d 285, 288 (1991). Instead, it is presumed a trial court considered all relevant mitigating and aggravating factors in fashioning a sentence, and that presumption will not be overcome absent explicit evidence from the record the trial court failed to consider mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158, 935 N.E.2d 1151, 1155 (2010). We may not substitute our judgment for that of the trial court merely because we might have weighed a factor differently. *Klein*, 2022 IL App (4th) 200599, ¶ 37.

¶ 51    " '[H]earsay testimony is not *per se* inadmissible at a sentencing hearing as unreliable or as denying a defendant's right to confront accusers.' " *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 31, 115 N.E.3d 423 (quoting *People v. Foster*, 119 Ill. 2d 69, 98, 518 N.E.2d 82, 94 (1987)). "An objection to such evidence goes to the weight of the evidence and not its admissibility." *Cunningham*, 2018 IL App (4th) 150395, ¶ 31. "Generally, double hearsay is admissible if " 'at least some parts of the double hearsay have been corroborated by other evidence.' " *Cunningham*, 2018 IL App (4th) 150395, ¶ 31 (quoting *Foster*, 119 Ill. 2d at 98). "Further, uncorroborated hearsay 'is not inherently unreliable,' particularly when the information was compiled during the course of an official investigation and where the evidence was never directly challenged." *Cunningham*, 2018 IL App (4th) 150395, ¶ 31 (quoting *Foster*, 119 Ill. 2d at 98).

¶ 52    Here, the trial court sentenced defendant to the maximum penalty of 30 years' incarceration for aggravated battery with a firearm consecutive to 14 years for unlawful possession of a weapon by a felon. Aggravated battery with a firearm is a Class X felony. 720 ILCS 5/12-3.05(e)(1), (h) (West 2016). For that offense, defendant faced a sentencing range of not less than 6 years and not more than 30 years of incarceration. 730 ILCS 5/5-4.5-25(a) (West 2016). Defendant was also convicted of Class 2 felony unlawful possession of a weapon, punishable by not less than 3 years and not more than 14 years of incarceration. 720 ILCS 5/24-1.1(e) (West 2016).

¶ 53    Defendant concedes Cherry's testimony was admissible. He argues, however, the trial court abused its discretion by affording too much weight to the testimony because of uncorroborated double hearsay. We disagree.

¶ 54          We first note, although Cherry's testimony contained double hearsay, Cherry personally conducted the investigation and witness interviews connected to Brown's shooting, and the testimony was further corroborated by physical evidence. Two separate individuals witnessed portions of the shooting and identified the truck. The owner of the truck then corroborated defendant had access to it at the time of the shooting and that defendant was in possession of a firearm. The victim also identified defendant as the shooter. Exhibits showing defendant was a contributor to DNA found on evidence recovered from the truck corroborated the testimony, and cartridge cases found at the scene matched the firearm found in defendant's waistband on December 12, 2017. Based on the number of shots fired and number of rounds left in the firearm, the cartridge case located in the truck bed likely came from the December 8 shooting.

¶ 55          Defendant further contends the reliability of Cherry's testimony was minimal. However, we have no reason to doubt Cherry's reliability given the corroborating evidence presented. As such, the trial court was free to consider the testimony when determining defendant's sentence. Nor will we reweigh the value of the evidence, which, as we note below, was not the only evidence the court considered when imposing the maximum sentence. Accordingly, the court did not abuse its discretion in considering Cherry's testimony or in the weight it gave his testimony in setting defendant's sentence.

¶ 56          Defendant also argues his sentence was disproportionate to the nature and circumstances of the offenses. However, the trial court stated it considered the nature and circumstances of the offenses and particularly noted the seriousness of defendant's conduct. Specifically, the court found defendant was a "dangerous individual," who "shoots people for whatever slight he perceives," which the count found "incredibly troubling." The court further

considered the presentence report, letters submitted on behalf of and by defendant, the comments of counsel and defendant, and evidence presented in aggravation and mitigation. Defense counsel made similar arguments at the hearing on the motion to reconsider sentence. In denying the motion, the court again stated defendant was dangerous and stated the sentence was imposed to protect other individuals.

¶ 57      Based on the foregoing considerations, the trial court's imposition of the maximum term for each sentence was not an abuse of its discretion.

¶ 58      III. CONCLUSION

¶ 59      Trial counsel was not ineffective for failing to file a motion to sever the charges, and defendant's sentence was not excessive. Accordingly, for the reasons stated, we affirm defendant's convictions and sentence.

¶ 60      Affirmed.